**UNITED STATES of America,
Plaintiff,**

v.

**Mark J. THORNTON, Defendant.**

**No. 3:05cr184(2).**

United States District Court,
S.D. Ohio,
Western Division.

May 14, 2007.

Vipal Patel, United States Attorney's Office, Dayton, OH, for Plaintiff.

**DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DOC. # 51); CONFERENCE CALL SET**

RICE, District Judge.

Defendant Mark J. Thornton ("Defendant" or "Thornton") is charged in the Indictment (Doc. # 20) with one count of conspiring to possess with intent to distribute in excess of 5 kilograms of cocaine and 50 grams of cocaine base, one count each of possessing with intent to distribute cocaine base and cocaine and one count of possessing a firearm in furtherance of a drug trafficking offense. Much of the evidence allegedly supporting these charges was seized when, on October 12, 2005, a search warrant was executed at 2316 Eastview Avenue, Dayton, Ohio. As a consequence, the Defendant has filed a motion, requesting that the Court suppress that evidence. *See* Doc. # 51. This Court has conducted an evidentiary hearing on Thornton's motion, and the parties have filed their post-hearing memoranda. *See* Docs. ## 63–67. The Court now rules upon Thornton's Motion to Suppress Evidence (Doc. # 51), beginning its analysis by setting forth its findings based upon the evidence presented.

On October 12, 2005, Detective Gregory Gaier ("Gaier") of the Dayton Police Department executed an affidavit with which he was able to obtain an anticipatory search warrant from Judge John Pickrel of the Dayton Municipal Court, authorizing the search of 2316 Eastview Avenue upon the occurrence of stated events.[1] In that affidavit, Gaier indicated, *inter alia*, that, in September, 2005, he had been told by a confidential informant that an individual

---

1. Gaier's affidavit, the search warrant and the inventory of items seized when the warrant was executed are Government Ex. 1.

called Vonno, whom Gaier knew to be Nirvana Martin ("Martin"),[2] had large amounts of crack and powdered cocaine inside the house at 2316 Eastview Avenue and that he (Martin) was selling such controlled substances from that location.[3] In his affidavit, Gaier also stated that in October, 2005, he had contacted that informant again, who indicated that he had seen a kilo of powdered cocaine inside 2316 Eastview Avenue and that Vonno and another male were present and actively selling narcotics from that location.[4] The other male is described in the search warrant as a 25–30 years old, black male, with a light complexion, 5'11" to 6'1" in height and weighing 230–250 pounds. There was no evidence introduced at the motion to suppress hearing that Thornton was that individual. The search warrant authorized executing officers to search Martin and the other male described therein. It did not authorize anyone else to be searched.

As indicated, the search warrant was an anticipatory warrant, meaning that certain conditions had to be met before that warrant could be served. In his affidavit, Gaier set forth the two conditions which would have to be met before the search warrant could be executed, to wit: the confidential informant enters 2316 Eastview Avenue and he or she confirms the presence of crack or powdered cocaine at that establishment. Before the search warrant was executed, Gaier traveled to the vicinity of 2316 Eastview Avenue and met the confidential informant. He then observed the confidential informant enter

that residence, where he or she remained for eight or ten minutes.[5] After leaving that structure, the confidential informant told Gaier that he had seen numerous bags of powdered cocaine in the kitchen inside of 2316 Eastview Avenue. Gaier then contacted the on-scene commander, Lieutenant Welsh, and told him that the conditions for the execution of the search warrant had been met. The latter then ordered that the warrant be executed.

When officers entered the at house 2316 Eastview Avenue to execute the search warrant, they walked into a sparsely furnished structure, which contained no indicia that it was being used or had been used as a residence by anyone, or even as a place to spend a night. On the contrary, that house was being used strictly as a commercial establishment, to wit: a place for the distribution of controlled substances. In the living room, there was only a small couch, a table and a television. The dining room contained a few chairs, an end table and another television to which a Play Station or an Xbox was attached. In the kitchen, there was a refrigerator, which contained a couple of two-liter bottles of Pepsi and left over fast food on paper plates covered by aluminum foil. Disposable, plastic cups and a microwave oven were also located in the kitchen. Rather than the cupboards and counters in that room containing dishes and pots and pans, they had digital scales and other drug paraphernalia stored on or in them.[6] The first floor bedroom had nothing in it other than a bag of cocaine in its closet.

---

2. Martin was Thornton's Co–Defendant in this prosecution; however, he has entered a guilty plea.

3. The informant identified Vonno as Martin, after having been shown a picture of him.

4. In his affidavit, Gaier also stated that officers had conducted surveillance at 2316 Eastview Avenue, observing pedestrian and vehicular traffic going to and leaving that location, activities consistent with the operation of a drug house. For instance, individuals would

enter that residence and stay inside for only a few moments, before exiting and leaving the area, Gaier also stated that Martin had previously been arrested for drug related offenses and that he had been seen leaving drug houses wearing a bullet proof vest.

5. Gaier was accompanied by his partner, Joey Meyers.

6. The cupboard also contained baking soda, which was described as being an ingredient

The second floor also contained only drugs and drug paraphernalia. Indeed, there were no beds, blankets, sheets, pillows or clothing anywhere in 2316 Eastview Avenue.

During the execution of the search warrant, officers seized, *inter alia*, a large quantity of powdered cocaine from various locations, crack cocaine, digital and other types of scales, baggies with and without cocaine residue on them, baking soda, a plate in the microwave with cocaine residue on it, a number of firearms, measuring cups with cocaine residue on them and pipes used to smoke crack cocaine.

Thornton was located in the dining room when officers entered the house at 2316 Eastview Avenue to execute the search warrant. He was handcuffed and told to lie on the floor, while the search continued. An officer removed four cellphones and $3,444 in cash from the Defendant's pockets. At the conclusion of the search, Thornton was released, rather than being arrested.

In both his motion and post-hearing memoranda, the Defendant argues that the Court should suppress the evidence seized from 2316 Eastview Avenue, because Gaier's affidavit failed to establish probable cause to believe that contraband or evidence of a crime would be found at that location and that the procedural requirements set forth in Rule 41 of the Federal Rules of Criminal Procedure were not followed.[7] The Government, in contrast, initially argues that Thornton's rights under the Fourth Amendment were not violated by the search of the house located at 2316 Eastview Avenue, because he did not have a legitimate or reasonable expectation of privacy in that location.

With the exception of the $3,444 in cash and the four cellphones that were taken from Thornton's person, this Court agrees with the Government that Defendant's rights under the Fourth Amendment were not violated, given that he lacked a legitimate expectation of privacy in the premises. Therefore, the Court concludes that the evidence seized from that location (other than the $3,444 in cash and the four cellphones seized from Thornton himself) cannot be suppressed, regardless of whether Gaier's affidavit established probable cause or whether there was compliance with Rule 41. Initially, the Court sets forth the reasons for concluding that Thornton did not have a legitimate expectation of privacy in 2316 Eastview Avenue and that, therefore, the execution of the search warrant at that location did *not* violate his rights under the Fourth Amendment or Rule 41. Then, the Court turns to the question of the suppression of the $3,444 in cash and the four cellphones that were seized from his person.

## I. *Legitimate Expectation of Privacy*

In *United States v. Whitehead*, 415 F.3d 583 (6th Cir.2005), the Sixth Circuit discussed the requirement that a defendant have a legitimate or reasonable expectation of privacy in the place searched:

Whitehead's principal argument on appeal is that the district court erred when it determined that Whitehead lacked a legitimate expectation of privacy at the 1299 Ashland house, which he concedes is not his residence. A place to be searched, however, "need not be [the defendant's] 'home,' temporary or otherwise, in order for him to enjoy a reasonable expectation of privacy there. The Fourth Amendment protects people,

used to cook powdered cocaine into crack cocaine.

**7.** In his motion (Doc. # 51), Defendant also requests that the Court suppress any state-

ments he may have made; however, since there is no evidence that he made a statement to officers, the Court need not discuss this request further.

not places, and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Minnesota v. Olson,* 495 U.S. 91, 96 n. 5, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (finding that a defendant who was a houseguest at the residence of two friends had a legitimate expectation of privacy in his own room) (citations and quotation marks omitted); *see also Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("[The] capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."). In order to claim Fourth Amendment protection, a defendant must therefore demonstrate that he possessed a legitimate expectation of privacy in the area searched. *Id.* at 587.

Recently, the Supreme Court has twice addressed the question of whether a person who lacks any legal interest in a residence nevertheless has a legitimate expectation of privacy therein, so that he may seek suppression of evidence gained as a result of an entry into the residence that violated the Fourth Amendment. In *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the defendant was arrested inside a residence by officers, who had entered it without a warrant or consent. Thereafter, the defendant made inculpatory statements to officers. The defendant moved to suppress those statements, arguing that they were fruit of his arrest which was illegal, because the officers had neither a warrant nor consent to enter the residence in which he was arrested. The Minnesota Supreme Court reversed the defendant's conviction, concluding that the trial court had erred by overruling his motion to suppress his statements. Upon further appeal, the United States Supreme Court affirmed, holding that the defendant had a legitimate expectation of privacy in the residence in which he had been arrested, even though he did not live there, because he had been an overnight guest there for several days, and had a change of clothes in the home at the time of his arrest. In *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), in contrast, the Supreme Court held that the defendants did not have legitimate or reasonable expectations of privacy in an apartment; therefore, the alleged search of that location did not violate their rights under the Fourth Amendment.[8] The *Carter* Court explained:

> If we regard the overnight guest in *Minnesota v. Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely "legitimately on the premises" as typifying those who may not [so claim], the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights.

*Id.* at 91, 119 S.Ct. 469.

In *United States v. Talley,* 275 F.3d 560 (6th Cir.2001), the Sixth Circuit applied *Olson* and *Carter:*

> The government argues that Talley, a mere guest at the home, had no expecta-

---

**8.** Looking through an opening in the closed, front window blinds by an officer was alleged to have been the search therein.

tion of privacy, and therefore lacks standing to challenge the officers' entry into the apartment. The government properly preserved this issue for appeal, although the district court did not address it, and we agree that Talley had no expectation of privacy in the home. The "Fourth Amendment protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched. *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1510 (6th Cir.1988). And[,] although an overnight guest may be able to establish a legitimate expectation of privacy in the home of his host, *see Minnesota v. Olson,* 495 U.S. 91, 98, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), persons who are in another's home solely for business purposes-as opposed to being on the premises for a personal occasion-do not have such an expectation of privacy. *Minnesota v. Carter,* 525 U.S. 83, 91, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). Talley, like the defendants in *Carter,* presented no evidence that he had been in the apartment for any period of time or for any purpose that would give rise to his having a legitimate expectation of privacy in that apartment. Therefore, Talley lacks standing to bring a Fourth Amendment challenge to the legality of Officer Rush's entry into the apartment.

*Id.* at 563.

■ Herein, Thornton failed to present any evidence that he had a legitimate or reasonable expectation of privacy in 2316 Eastview Avenue.[9] For instance, there is no evidence that he was the owner or lessee of that location or even that he was on the premises as a result of permission granted by the person having authority over that house (i.e., its owner or lessee). Moreover, there was no evidence that the Defendant or anyone else was living at that address or had even stayed there overnight. There were no beds, blankets, pillows or sheets therein. Indeed, given that the house was sparsely furnished with no pots or pans in the kitchen and the only food in the refrigerator being left over fast food, this Court finds that 2316 Eastview Avenue was not serving as a residence or a place to sleep overnight for anyone. On the contrary, the quantity of drugs and drug paraphernalia seized at that location cause this Court to find that it was being utilized as a commercial establishment related to the distribution of powdered and crack cocaine. Consequently, like the defendant in *Talley,* Thornton did not have a legitimate or reasonable expectation of privacy in 2316 Eastview Avenue. Moreover, in the absence of evidence that Thornton was inside the house at 2316 Eastview Avenue with the permission of the person having authority over it, this Court must conclude that he was a trespasser. The Sixth Circuit has held that trespassers do not have a legitimate expectation of privacy in the place on which they are trespassing. *United States v. Hunyady,* 409 F.3d 297 (6th Cir.), *cert. denied,* 546 U.S. 1067, 126 S.Ct. 810, 163 L.Ed.2d 637 (2005). *See also, United States v. McRae,* 156 F.3d 708, 711 (6th Cir.1998) (holding that a defendant who had been living in a vacant house for approximately one week failed to demonstrate that he had a legitimate ex-

---

**9.** Instead of arguing that he had a legitimate expectation of privacy in 2316 Eastview Avenue, the Defendant asserted that the Court should dispense with that requirement in this case. *See* Doc. #65 at 4. Given that this Court is not free to disregard Supreme Court authority, it cannot accept Defendant's request in that regard.

pectation of privacy). However, even if the evidence had established that Thornton was at 2316 Eastview Avenue with the permission of its owner, this Court would nevertheless conclude that, in accordance with *Carter, supra,* he lacked a legitimate expectation of privacy in that location, since, like the defendants in *Carter,* Thornton was at 2316 Eastview Avenue in order to engage in a commercial activity relating to the distribution of controlled substances, i.e., the sale and/or purchase of drugs.

■ Since he was without a legitimate or reasonable expectation of privacy, the Court overrules Defendant's Motion to Suppress Evidence (Doc. # 51), as it relates to the evidence seized when the search warrant was executed on October 12, 2005, at 2316 Eastview Avenue, other than the cash and cellphones which were taken from his pockets.[10]

## II. Cash and Cellphones Seized from Thornton

As indicated, $3,444 in cash and four cellphones were taken from Thornton's person. Rather than arguing that the Defendant lacked a reasonable expectation of privacy in his own person, the Government contends that this evidence cannot be suppressed, because frisking the Defendant was acceptable under decisions which have applied the principles first enunciated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See* Doc. # 64 at 6–7.

■ Parenthetically, even though the Government has not raised the question, it is self-evident that the Defendant had a legitimate expectation of privacy in his person and, thus, may challenge the search of himself. In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court noted that Fourth Amendment rights are personal and held that the "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 S.Ct. 421. The Fourth Amendment provides in part that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated...." Consequently, the Fourth Amendment expressly provides that Thornton had a legitimate expectation of privacy in "the invaded place," his "person".

■ Under the Fourth Amendment, police must obtain a search warrant before conducting a search, subject to certain well

---

10. Parenthetically, even if the Court had concluded that Defendant had such an expectation of privacy, it nevertheless would have declined to suppress that evidence, since Gaier's affidavit and the fact that the conditions on the execution of that warrant were met establish that the search warrant was supported by probable cause. It is axiomatic that " 'probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' " *United States v. Wright,* 16 F.3d 1429, 1438 (6th Cir.) (quoting *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)), *cert. denied,* 512 U.S. 1243, 114 S.Ct. 2759, 129 L.Ed.2d 874 (1994). Herein, Gaier indicated in his affidavit that the infor-

mant had been in 2316 Eastview Avenue on two occasions, in September and October, 2005, and that he had observed individuals therein selling cocaine and crack. In addition, Gaier had confirmed the information supplied by the informant, by conducting surveillance at that location and observing that the flow of vehicular and pedestrian traffic was consistent with the operation of a place where drugs were being sold. Moreover, in order to ensure that the information set forth in Gaier's affidavit had not become stale, the search warrant could not be served until the informant had entered 2316 Eastview Avenue and observed cocaine. After he had done so, the search warrant was served.

recognized exceptions. *United States v. Haddix*, 239 F.3d 766, 767 (6th Cir.2001). Herein, the Government must rely upon an exception to the warrant requirement, because, although the search warrant authorized officers to search an unidentified individual, in addition to Martin, there was neither evidence nor argument from the Government that Thornton was that individual. In this prosecution, two of those exceptions are possibly applicable, to wit: a search incident to a lawful arrest and a frisk under *Terry*. As a means of analysis, the Court will address these two possible exceptions in the above order.

The Government has not argued that the search of Thornton was lawful under the search-incident-to-a-lawful-arrest exception to the warrant requirement. Nevertheless, to ensure the most complete record, this Court will address this exception. In *United States v. Montgomery*, 377 F.3d 582 (6th Cir.2004), *cert. denied*, 543 U.S. 1167, 125 S.Ct. 1347, 161 L.Ed.2d 143 (2005), the Sixth Circuit reviewed certain principles applicable to this exception to the warrant requirement:

> Under the "search-incident-to-a-lawful-arrest" exception to the warrant requirement, a law enforcement officer may conduct a full search of an arrestee's person incident to a lawful custodial arrest. *United States v. Robinson*, 414 U.S. 218, 234–35, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (explaining that the reasoning behind this exception is the "need to disarm the suspect in order to take him into custody [and] . . . the need to preserve evidence on his person for later use at trial"). Moreover, as the Supreme Court held in *Rawlings v. Kentucky*, 448 U.S. 98, 110–11 n. 6, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the search-incident-to-a-lawful-arrest rule also permits an officer to conduct a full search of an arrestee's person before he is placed under lawful custodial arrest as long as "the formal arrest follow[s]

quickly on the heels of the challenged search of . . . [his person]" and the fruits of that search are not necessary to sustain probable cause to arrest him. *Cf. Knowles v. Iowa*, 525 U.S. 113, 116–19, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (holding that the search-incident-to-a-lawful-arrest rule does not apply to an officer's search of the defendant's vehicle where the officer, while subsequently arresting the defendant for drug-law violations based upon that search, never actually arrested the defendant for the speeding violation, which gave the officer the probable cause to arrest the defendant before the search, but, rather, only issued a citation, and reasoning that the rule's underlying twin rationales of officer safety and evidence preservation were only minimally present and not present at all, respectively, in the context of a traffic citation); *Smith v. Ohio*, 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990) (holding that the search-incident-to-a-lawful-arrest rule does not apply to a warrantless search that provides the probable cause for the subsequent arrest because one cannot justify the arrest by the search and then simultaneously justify the search by the arrest).

*Id.* at 586.

■ Herein, although the Defendant was handcuffed and told to lie on the floor while the search warrant was executed, he was released at the conclusion of the search, rather than being taken into custody. Under those circumstances, this Court is compelled to conclude that Thornton was detained in accordance with *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), rather than being subjected to a custodial arrest when he was handcuffed during the execution of the warrant. In *Summers*, the Supreme Court held that law enforcement officers

were permitted to detain or to seize the occupants of a structure being searched pursuant to a search warrant. Therein, the defendant was detained, but not handcuffed, while a search warrant was executed at his residence. On the basis of evidence discovered in the basement of that structure, the defendant was thereafter arrested and searched, incident to that arrest. The search of the defendant revealed that he was in possession of 8.5 grams of heroin, for which he was indicted. He successfully moved to suppress that heroin, arguing that it was the fruit of his illegal detention while the search warrant was being executed. After the Michigan appellate courts had affirmed, the State of Michigan obtained further review from the United States Supreme Court. The Court assumed that the seizure of the defendant was not supported by probable cause and held that the issuance of a search warrant included "the limited authority to detain the occupants of the premises while a proper search [of the premises] is conducted." *Id.* at 705, 101 S.Ct. 2587. Thornton was an occupant of 2316 Eastview Avenue when the search warrant was executed. Nevertheless, there may be a factual difference between this case and *Summers,* given that there was no indication that the defendant therein had, like Thornton, been handcuffed during the execution of the search warrant. That factual distinction does not alter this Court's conclusion that Thornton was seized in accordance with *Summers,* rather than being subjected to a custodial arrest. In *United States v. Head,* 2007 WL 414276 (6th Cir.2007) (unreported), the Sixth Circuit held that *Summers* applied to the defendant's detention, even though he had been handcuffed and seized a mile from his residence where a search warrant was being executed.

Accordingly, this Court concludes that the seizure of the cellphones and cash from the person of the Defendant was not in accordance with a search incident to an arrest.

Turning to the question of whether that seizure was proper under *Terry* and its progeny, which the Government does argue, this Court accepts for present purposes, given all the circumstances set forth above, that the officer who frisked Thornton had reasonable suspicion to believe that he was armed. Nevertheless, while the *Terry* frisk was permissible, since the Government failed to introduce evidence that the seizure of the cellphones and the cash was in compliance with *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), this Court concludes that those items must be suppressed.

In *Dickerson,* an officer stopped and frisked the defendant in a manner that was justifiable under *Terry* (i.e., supported by reasonable suspicion). During the course of the frisk, the officer felt a lump in a pocket of the defendant's jacket, which he (the officer) manipulated through the fiber of the jacket, until he concluded that it was a rock of crack cocaine. He then removed the lump from the coat and discovered that his conclusion was correct. After the state appellate courts concluded that the rock of crack cocaine had to be suppressed, because the officer had overstepped the bounds of *Terry* by seizing that contraband, the Supreme Court granted the state's request for further review. In determining whether the crack cocaine had been properly suppressed, the *Dickerson* Court applied *Terry* and its progeny, initially reiterating that the purpose of a *Terry* frisk is not to discover evidence of a crime, but to discover weapons which might be used to harm the officer or others nearby and that, if the protective search goes beyond that which is necessary to determine whether the suspect is armed, the fruits thereof must be sup-

pressed. 508 U.S. at 373, 113 S.Ct. 2130. Turning to the question of "whether police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by *Terry*," the Supreme Court held that it was permissible, "so long as the officers' search stays within the bounds marked by *Terry*." *Id.* To reach that conclusion, the Supreme Court analogized the tactile discoveries made by an officer when conducting a *Terry* frisk to the plain-view doctrine. *Id.* at 375, 113 S.Ct. 2130 (noting that "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons"). However, because the officer therein had only been able to determine that the lump in the defendant's pocket was a rock of crack cocaine by manipulating it, the Supreme Court held that the officer had overstepped the bounds of *Terry* and that, therefore, the seized contraband had been properly suppressed.[11] *Id.* at 378, 113 S.Ct. 2130.

■ Herein, this Court is initially unable to conclude that the cellphones are contraband, given that they have become such ubiquitous instruments of modern American life. It bears noting that the *Dickerson* Court did not reject the holding that the purpose of . a protective search under *Terry* is not to discover evidence, but rather to permit police officers to protect themselves by ascertaining whether a suspect is armed. Assuming for present purposes that the $3,444 in cash seized from Thornton was contraband, rather than merely evidence of criminal activity,[12] this Court concludes that the Government has not met its burden of demonstrating that it was readily apparent, without manipulation, that the lump in Defendant's pocket, that turned out to be cash (assuming it was a lump) was indeed cash.[13] The Government did not call as a witness at the suppression hearing the officer who had searched Thornton or anyone else having any knowledge of that activity. Thus, there was no testimony that either the cellphones or the cash felt like a weapon, which would have authorized the officer searching Thornton to remove those items from his pockets and, perhaps, seize them under the plain view doctrine even if they were not contraband. But, as indicated, the Government did not attempt to present such evidence. Without evidence to the contrary, the Government has failed to show that the frisking/searching officer stayed within the bounds marked by *Terry*.

Accordingly, the Court sustains the Defendant's Motion to Suppress Evidence (Doc. # 51), as it relates to the four cellphones and the $3,444 in cash taken from him on October 12, 2005, during the execution of the search warrant at 2316 Eastview Avenue.

---

11. The Government merely contends that the cellphones and cash taken from Thornton need not be suppressed, because the protective search of him was proper under decisions which have applied the principles established in *Terry*. The Government has not argued that those items of evidence were properly seized under the application of *Terry* adopted by the Supreme Court in *Dickerson*. As set forth above, such a claim would have been unavailing, based upon the evidence presented at the suppression hearing.

12. *Dickerson* mentions only contraband, rather than mere evidence of criminal activity. In this Court's opinion, this is a distinction without a difference.

13. It is appropriate to impose the burden of persuasion concerning this question on the Government, given that *Dickerson* is an application of *Terry* and the Sixth Circuit has stressed that the Government has the burden under that decision. *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir.1990).

Counsel should note that the Court has scheduled a telephone conference call on Thursday, May 17, 2007, at 8:45 a.m., for the purpose of selecting a new trial date for this prosecution.