As the government points out, however, the *Dickerson* majority expressly incorporated existing decisions, like *Quarles*, into the "constitutional" right to a *Miranda* warning it elucidated in *Dickerson*. 120 S.Ct. at 2335. Moreover, the Supreme Court has recently reminded us that lower courts should not overrule its decisions, even if later opinions cast doubt on such precedent. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997). Rather, we are to leave to the Court whether to overrule its prior decisions. Therefore, *Quarles* remains good law and, as applied to the facts of this case, excuses the interrogation of the defendant.

For the forgoing reasons, we reverse the district court's decision to grant the suppression motion and remand the case for further proceedings.

---

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0438P (6th Cir.)
File Name: 01a0438p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

UNITED STATES OF AMERICA,
     *Plaintiff-Appellant,*

     *v.*                                   No. 00-5659

CURTIS TALLEY,
          *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 99-10064—James D. Todd, Chief District Judge.

Argued: October 30, 2001

Decided and Filed: December 28, 2001

Before: KEITH, KENNEDY, and BATCHELDER, Circuit Judges.

————————

## COUNSEL

**ARGUED:** John T. Fowlkes, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellant. Danny R. Ellis, HARDEE, MARTIN, JAYNES & IVY, Jackson, Tennessee, for Appellee. **ON BRIEF:** John T. Fowlkes, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellant. G. William Hymers III,

HARDEE, MARTIN, JAYNES & IVY, Jackson, Tennessee, for Appellee.

_____

## OPINION

_____

KENNEDY, Circuit Judge.  The United States appeals the District Court's order suppressing defendant's statement obtained before he was given warnings per *Miranda v. Arizona*, 384 U.S. 436 (1966).  Local sheriffs sought to execute a federal arrest warrant on one Vidale Cothran, in whose home Talley was a guest.  The government concedes that no *Miranda* warning had been given but contends that the question asked--"Where is the gun?"--was permitted under the public policy safety exception set out in *New York v. Quarles*, 467 U.S. 649 (1984).  The government now appeals both the order suppressing the statement and the denial of its motion for reconsideration.

We review findings of fact regarding suppression motions for clear error and conclusions of law *de novo*.  *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996).  Applying the *de novo* standard to the legal questions posed by this appeal, we find that the defendant Talley lacked standing to object to the entry into the apartment because he had no privacy expectation. Moreover, the officer's entry, through which he saw the magazine of a semi-automatic weapon and ammunition (which prompted his question), was permitted under the *Quarles* exception. Therefore, we reverse and remand.

## I.  Factual Background

There is no dispute as to the facts underlying the defendant's arrest.  Because the context of the arrest is important in determining the legality of the officers' actions, we review the factual record at some length.

previously shouted for everyone to come out.  When Officer Rush asked the second detained individual, Talley, whether any others remained in the house, Talley's response was that his girlfriend was inside the house.  Thus, Officer Rush was understandably surprised and threatened by the appearance of the two shadowy figures.  This potential threat justified Rush's entry into the residence; and through that entry, Officer Rush discovered the magazine and ammunition.  Once Officer Rush had seen the magazine, he had reason to believe a gun was nearby and was justified, under *Quarles*, in asking his question prior to administering a *Miranda* warning. The district court concluded that Rush failed to explain why it was necessary to step in.  The district court concluded that since Officer Rush could instead have stepped out rather than in, and had he done so he would not have seen the magazine and ammunition,  the discovery of the gun could not be considered in determining whether the sweep was justified. Officer Rush had his gun drawn when he ordered these two men to come out.  Had he stepped out and they had not come out, he would have had to re-enter in order to secure them. He could not have known whether or not they were armed.  It was light outside and dark in the hall, which would have made it difficult for Rush to see anything inside the residence. Therefore, based on an objective standard, he pursued the most reasonable course.

Defendants urge us to overrule *Quarles* based on the Supreme Court's decision in a recent Fifth Amendment case, *Dickerson v. United States*, 120 S.Ct. 2326 (2000), which seems to contradict language in *Quarles*.  In *Dickerson*, the Court held that the right to a *Miranda* warning is constitutionally based, rather than "prophylactic."  The *Quarles* court seemed to justify the public safety exception to *Miranda* by distinguishing prophylactic and constitutional rights.  *See Quarles*, 467 U.S. at 653 n.3. Justice Scalia, writing in dissent in *Dickerson*, suggested that making a *Miranda* warning a constitutional right rather than a prophylaxis would undermine the Court's decision in *Quarles*. *Dickerson*, 120 S.Ct. at 2341.

(1990).  The Supreme Court has held that "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers" is permissible if an officer has a "reasonable belief" based on "specific and articulable facts" together with "inferences from those facts" which reasonably warrants the officer in believing that the area to be swept harbors an individual or individuals "posing a danger to the officer or others." 494 U.S. at 327.

In this case, the officers heard a considerable amount of noise prior to Officer Rush's entry.  The individuals in the house did not open the door for nearly thirty minutes after the initial knock by the officers.  The officers were reasonably concerned that other individuals had concealed themselves in the house in a position to ambush the officers.  This concern is demonstrated by the officers' decision to don bulletproof vests.  At no point during the challenged sweep did the officers remove their vests, suggesting they did not feel truly safe.

We cannot agree with the district court that concern for safety did not justify Officer Rush stepping into the home upon seeing the two shadowy figures in the rear of the hallway.[1]  Officer Rush, who was standing in the doorway, stepped in to permit them to pass.   The officer had an articulable fact at his disposal indicating these individuals posed a safety risk; namely, that he had already been misinformed about their presence.   Officer Rush had

---

[1]In response to a motion by Vidale Cothran, the district judge suppressed the drugs and other evidence obtained during and after the "protective sweep" conducted by the officers.  Though Cothran is no longer a party to this case, the drugs will undoubtedly be sought to be introduced against Talley (indeed, he took responsibility for the drugs).   While Talley made no motion to suppress the drugs, the order is captioned with both defendants' names.  The district court's order was ambiguous as to whether the evidence was suppressed as to both defendants or merely to Cothran. Because Talley had no expectation of privacy and Officer Rush's entry was justified under *Buie*, the drug evidence is admissible against Talley.

On August 23, 1999, five officers of the Shelby County Sheriff's department sought to execute a federal arrest warrant for one Vidale Cothran at his residence at 6915 Water Grove in Memphis, Tennessee.  Two officers went to the rear door while two stayed in front.  The fifth officer at some point before the entry left for the manager's office to get information about who might be in the apartment and did not return until after the statement was made.  The officers knocked on the front door and saw an individual look out from one of the windows.  Officer Andrew Rush showed his badge, identified himself, and called for the individual to come to the door.  The officers heard a loud commotion and the sounds of several individuals running throughout the apartment and up and down the stairs.  Concerned for their safety, the officers donned bulletproof vests.  After knocking on the door again, Officer Rush turned off electricity to the home.  Cothran opened the door and obeyed the officers' request that he lie down on the ground.  Approaching Cothran, Rush saw movement behind him in the residence.  Rush secured a second individual (Talley), and asked him if anyone remained in the residence.  Talley indicated that his girlfriend was still inside.  Subsequently Rush saw a female, whom he also secured.  At that moment Officer Rush, who was standing in the front doorway, saw two heads "pop up" at the end of the hallway.  The officer stepped inside the front door and ordered the individuals to come forward.

As he stepped into the apartment, Officer Rush bumped into a trash can and saw bullets and a magazine for a semiautomatic pistol in plain view inside the can (which was between six and twelve feet inside the residence).  He notified other officers of the presence of the magazine and bullets and the possible presence of a firearm, and then opened the back door to the house to enable one of the two officers waiting there to pass through the house to assist the single officer remaining on the porch in securing the five individuals.

Officer Rush then returned to the front of the house and asked the secured individuals, "Where is the gun?" Defendant said the gun could be found in the vacuum cleaner, where it

was later discovered. Two officers began a protective sweep of the second floor, looking in all the rooms and checking the closets. During the sweep, Officer Rush reconnected power to the residence. The sweep revealed no other individuals, and initially no contraband. As Officer Rush was passing by the kitchen on his way to exit the house, he smelled something burning in the kitchen. He looked in the kitchen area and saw that a towel had begun to burn on one of the electric burners on the stove. Rush removed the towel and then saw several items of drug paraphernalia including a white substance later identified as cocaine base. Subsequently, Cothran consented to a search and drug dogs were brought to the house.

## II. Analysis

The district court granted Talley's motion to exclude his statement concerning the location of the gun. App. at 65-66. It is undisputed that Talley had received no *Miranda* warning when he and the others were asked the location of the gun. While the district court noted there was no evidence that this "statement[] was anything other than voluntary," App. at 65, it found that the question constituted a violation of the ban on interrogation without a *Miranda* warning. The court held that the officers had violated the Fourth Amendment by entering the apartment without justification, and therefore that the *Quarles* exception to *Miranda* did not apply. The court concluded that "the officers had no reasonable, articulable basis for believing there was anyone else in the apartment posing a safety threat and thus justifying the protective sweep." App. at 63. The district court suppressed the magazine and the bullets on co-defendant Cothran's motion to suppress since it concluded, with analysis, that they were spotted after an illegal entry.

The government argues that Talley, a mere guest at the home, had no expectation of privacy, and therefore lacks standing to challenge the officers' entry into the apartment. The government properly preserved this issue for appeal, although the district court did not address it, and we agree that

Talley had no expectation of privacy in the home. The "Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967). It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched. *United States v. Sangineto-Miranda,* 859 F.2d 1501, 1510 (6th Cir. 1988) And although an overnight guest may be able to establish a legitimate expectation of privacy in the home of his host, *see Minnesota v. Olson,* 495 U.S. 91, 98 (1990), persons who are in another's home solely for business purposes--as opposed to being on the premises for a personal occasion–do not have such an expectation of privacy. *Minnesota v. Carter,* 525 U.S. 83, 91 (1998). Talley, like the defendants in *Carter,* presented no evidence that he had been in the apartment for any period of time or for any purpose that would give rise to his having a legitimate expectation of privacy in that apartment. Therefore, Talley lacks standing to bring a Fourth Amendment challenge to the legality of Officer Rush's entry into the apartment.

Because Talley had no expectation of privacy in the house, he cannot challenge the events preceding the officer spotting the magazine and ammunition inside the trash can. Therefore, his *Miranda*-less questioning is controlled by *New York v. Quarles*, 467 U.S. 649 (1984). It is well settled that warrantless interrogation is permitted when officers have a reasonable belief based on articulable facts that they are in danger. The question of whether a belief is reasonable is one we review *de novo*, since the reasonableness test is objective, not subjective. *See Quarles*, 467 U.S. at 656 ("[T]he availability of that exception does not depend upon the motivation of the individual officers involved. . . . [and] should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer.").

The officers had legal justification for entering the residence, as a result of which Officer Rush saw the magazine and ammunition, under *Maryland v. Buie*, 494 U.S. 325