**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 12a1313n.06

**Nos. 11-3297, 11-4236, 11-4240**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Dec 28, 2012**

DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

      **Plaintiff - Appellee,**

v.

ANDRE REESE;
EDWIN PEAVY,

      **Defendants - Appellants.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

                                    /

**BEFORE:**    CLAY and STRANCH, Circuit Judges; BELL, District Judge.[*]

     **CLAY, Circuit Judge.** In this consolidated appeal, Defendants Andre Reese and Edwin Peavy appeal their sentences after pleading guilty to charges relating to a conspiracy to commit wire fraud and aggravated identity theft in violation of 18 U.S.C. §§ 1349 & 1028A. Peavy also appeals his conviction by a jury of one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). For the reasons that follow, we **DISMISS** Reese's appeal as barred by the appeal waiver in his plea agreement, and we **AFFIRM** Peavy's conviction and sentence.

---

     [*] The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

**BACKGROUND**

From August 2009 through April 1, 2010, nine individuals, including Reese and Peavy, participated in a conspiracy to obtain the personal information of consumers who held credit cards associated with various large retailers. One of the co-conspirators not part of this appeal, Dimorio McDowell, obtained account holders' names, addresses, dates of birth, social security numbers, and credit card numbers, and used this information to open credit card accounts in other people's names, add co-conspirators' names as authorized users to other accounts, or make changes to the credit limits on these accounts. McDowell sent the fraudulently-obtained personal information to his co-conspirators in Cleveland, Ohio. The Cleveland conspirators then visited retailers and used the credit cards to purchase goods and merchandise, some of which they kept and some of which they sold. Reese admitted in his plea agreement that he and his co-conspirators made 34 unauthorized purchases at various retailers in the Cleveland area, and that these fraudulent purchases totaled $219,602.88.

On April 1, 2010, at approximately 7:00 a.m., federal and local law enforcement officers planned to execute an arrest warrant for Peavy at his mother's residence in Cleveland, where Peavy was known to reside. Detective Ken Mifflin of the Stow Police Department prepared the plan for executing the arrest warrant, which included a review of Peavy's criminal history. All of the officers on the arrest team were aware of Peavy's criminal background. When the arrest team approached the house, they observed three vehicles parked in the driveway, including the vehicle that Peavy often drove. Detective Mifflin testified that he heard the voices of at least two people inside the house when he approached the side door.

Other members of the arrest team began knocking loudly on the front door and shouting "Police." Approximately two minutes passed before Peavy came to the door; during that time, an officer observed someone peeking through the blinds at the front of the house. Peavy stated that he needed a key to open the front door, and when he finally opened it, he was immediately ordered by FBI Special Agent Steve Sloan to lay on the ground. Peavy was then placed in handcuffs and taken to the front porch. Either while Peavy was lying on the floor inside the house or just after he was brought outside, Sloan asked him if there was anyone else in the house, and Peavy responded that there was one other person inside. Sloan asked him if he had any weapons in the house, and Peavy responded that there was a shotgun underneath the couch cushions. There was conflicting testimony as to whether Peavy also stated that the shotgun belonged to him.

After being told that there was at least one more person and a weapon inside the house, the officers conducted a protective sweep of the residence. The officers found the other man that Peavy had told them about, Otez Hutson, who informed them that he had discarded a loaded handgun in the kitchen trashcan as the police arrived. Peavy was then taken to be interviewed by the FBI. He was read his *Miranda* rights prior to that interview, but at no time prior to his formal interview was Peavy advised of his constitutional rights. At his first interview, the questioning focused exclusively on Peavy's participation in the identity theft conspiracy, and no questions were asked about his possession of the firearm.

On April 27, 2010, nine defendants, including Reese and Peavy, were charged in a 27-count indictment alleging violations of various federal criminal statutes, including conspiracy to commit wire fraud, access device fraud, and aggravated identity theft. On November 9, 2010, while the

3

identity theft case was still pending, Peavy was separately indicted on one count of being a felon in possession of a firearm.

On December 6, 2010, Reese pleaded guilty, pursuant to a written plea agreement, to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A. The other counts against Reese were dismissed on motion of the government. On March 8, 2011, the district court conducted a sentencing hearing, at which it sentenced Reese to 92 months' imprisonment on the conspiracy count and 24 months' imprisonment on the identity theft count, with the sentences to run consecutively, for a total term of imprisonment of 116 months. The district court also ordered restitution in the amount of $219,602.88. On March 23, 2011, Reese filed a timely notice of appeal.

Also on December 6, 2010, Peavy pleaded guilty, pursuant to a written plea agreement, to one count of conspiracy to commit wire fraud, but his firearms charge was set for a jury trial. On January 6, 2011, Peavy filed a motion to suppress the statements he made during his arrest, as well as the firearm that was recovered as a result of his statements. The district court conducted a suppression hearing and denied Peavy's motion. On August 23, 2011, a jury convicted Peavy of one count of being a felon in possession of a firearm. The district court consolidated the two charges against Peavy for purposes of sentencing. The court conducted a sentencing hearing on October 26, 2011, and sentenced Peavy to 100 months' imprisonment for the two charges, with the sentences to run concurrently. Peavy filed timely notices of appeal.

## DISCUSSION

On appeal, Reese challenges the district court's amount of loss finding and its restitution order, arguing that they were not properly calculated. Peavy argues that the district court's denial of his motion to suppress should have been granted because of a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that his conspiracy sentence was procedurally and substantively unreasonable.

### A.   Reese's Appeal Waiver

We review the district court's amount of loss finding for clear error and consider the methodology behind it *de novo*. *United States v. Poulsen*, 655 F.3d 492, 512 (6th Cir. 2011). The amount of loss calculation for purposes of the United States Sentencing Guidelines is distinct from the district court's decision to order restitution. We review the question of whether the law permits restitution *de novo*, and the amount of a restitution award is reviewed for abuse of discretion. *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009).

Reese cannot bring either of these challenges to his sentence, however, because he has waived his right to appeal. Reese waived his right to appeal nearly all aspects of his conviction and sentence pursuant to his written plea agreement, including the district court's calculation of the amount of loss and its decision to order restitution. "[A] defendant in a criminal case may waive any right, even a constitutional right, by means of a plea agreement." *United States v. McGilvery*, 403 F.3d 361, 362 (6th Cir. 2005). Through a plea agreement, a defendant "may waive constitutional or statutory rights then in existence as well as those that courts may recognize in the future." *United*

*States v. Bradley*, 400 F.3d 459, 463 (6th Cir. 2005). Reese specifically agreed to the following

language in his plea agreement:

> **Waiver of Appellate Rights**. Defendant acknowledges having been advised by counsel of Defendant's rights, in limited circumstances, to appeal the conviction or sentence in this case, including the appeal right conferred by 18 U.S.C. § 3742, and to challenge the conviction or sentence collaterally through a post-conviction proceeding, including a proceeding under 28 U.S.C. § 2255. Defendant expressly and voluntarily waives those rights, except as specifically reserved below. Defendant reserves the right to appeal: (a) any punishment in excess of the statutory maximum; and (b) any sentence to the extent it exceeds the maximum of the sentencing range determined under the advisory Sentencing Guidelines in accordance with the sentencing stipulations and computations in this agreement, using the Criminal History Category found applicable by the Court. Nothing in this paragraph shall act as a bar to Defendant perfecting any legal remedies Defendant may otherwise have on appeal or collateral attack with respect to claims of ineffective assistance of counsel or prosecutorial misconduct.

(R. 103-1, ¶ 21.)

Reese's appeal waiver uses standard language that has been approved by this Court in the

past. *See, e.g.*, *United States v. Ferguson*, 669 F.3d 756, 765 (6th Cir. 2012). Reese does not

challenge the validity of the plea waiver itself, which would be void if his agreement to it was not

"knowing and voluntary." *See United States v. Smith*, 344 F.3d 479, 483 (6th Cir. 2003). Nor does

Reese argue that the district court did not comply with Federal Rule of Criminal Procedure 11, which

requires that defendants be informed of and understand the terms of their plea agreements. *See*

*United States v. Sharp*, 442 F.3d 946, 951 (6th Cir. 2006). The district court complied fully with the

requirements of Rule 11, verified on the record that Reese understood the contents of his plea

agreement, and Reese indicated that he had no questions and understood the nature of the agreement.

Reese's attempts to escape the confines of his appeal waiver are unpersuasive. He does not

directly contend that the district court's amount of loss determination falls within one of the two

express exceptions to the waiver. He argues that a "careful reading" of the appeal waiver does not "contain precise or stipulated language concerning either the amounts of actual loss or the agreed upon restitution to be ordered." Appellant's Reply Br. 6. While Reese did not specifically agree to forego a challenge to the loss amount or restitution order, he expressly waived any right to appeal the "conviction or sentence in this case" unless the sentence either exceeded the statutory maximum or the top of the Sentencing Guidelines range. Reese fails to show how the loss amount or restitution determination falls outside the broad language of the waiver.[2] We have previously held that identical appeal waiver language bars a defendant from challenging a restitution order on appeal. *See Sharp*, 442 F.3d at 952 (finding that a restitution order does not fall within the two explicit exceptions to an appeal waiver). Because Reese waived his appellate rights, we lack jurisdiction to consider this appeal, and it will be dismissed. *See McGilvery*, 403 F.3d at 363.

Even if Reese's plea agreement did not bar our consideration of his appeal, his attacks on the district court's amount of loss determination and restitution order have no merit. Pursuant to Federal Rule of Criminal Procedure 32(i)(3), the district court at sentencing "may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A). Simply, Reese stipulated to the loss amount in the plea agreement, and he cannot now assert that it was somehow

---

[2] In *United States v. Freeman*, 640 F.3d 180 (6th Cir. 2011), we held that a challenge to a restitution order was not barred by an appeal waiver identical to Reese's because the defendant alleged that the restitution was not based on conduct underlying his conviction. *Id.* at 194. Because restitution is authorized only for conduct underlying a conviction, this Court held that a broader restitution order was a "punishment in excess of the statutory maximum," and therefore within one of the express exceptions to the appeal waiver. *Id.* In the instant case, Reese's restitution order was based on his participation in a conspiracy—a situation that the *Freeman* court specifically acknowledged would be barred by the appeal waiver. *See id.* at 193 (distinguishing *Sharp*). In any event, Reese does not argue that his restitution order exceeds the statutory maximum.

a disputed fact. Reese agreed that, for purposes of the Sentencing Guidelines, the loss amount was greater than $200,000 but less than $400,000. The relevant conduct that Reese expressly acknowledged in the plea agreement reflected a total loss amount of $219,602.88. Therefore, the district court did not err in adding 12 points to Reese's base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(G).

Reese's claim that the district court's restitution order was incorrectly calculated also fails on the merits. Reese first argues that his restitution obligation should have been offset by the value of the property recovered by the government. However, the district court was statutorily required to order restitution in "the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A). For that reason, when stolen property is forfeited to the government and not returned to the victims, defendants' restitution obligations are not offset by the amount of property seized by the government. *See United States v. McCracken*, 487 F.3d 1125, 1128–29 (8th Cir. 2007) ("[T]he district court has no discretion to adjust the total restitution due to the victim based on funds held by law enforcement."); *United States v. Bright*, 353 F.3d 1114, 1122–23 (9th Cir. 2004); *United States v. Alalade*, 204 F.3d 536, 540 (4th Cir. 2000). Reese does not contend that some of the property seized by the government has been returned to the victims. Therefore, his restitution obligation should not be offset by the amount of the forfeiture. Reese further argues that the district court ordered restitution for intended losses rather than actual losses. While a restitution order must be based only on actual losses, *see United States v. Simpson*, 538 F.3d 459, 465–66 (6th Cir.2008), there is no evidence that the district court based the restitution amount on anything other than the actual losses that Reese acknowledged in his plea agreement.

**B.      Peavy's Motion to Suppress**

When evaluating a district court's ruling on a motion to suppress evidence, this Court reviews findings of fact for clear error and conclusions of law *de novo*. *United States v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010). A factual finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Id*. (citing *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)). Due regard must be given to the trial court's opportunity to judge the credibility of the witnesses. *United States v. Blair*, 524 F.3d 740, 749 (6th Cir. 2008). A decision on a motion to suppress must be considered in the light most favorable to the party that prevailed in the court below. *Smith*, 594 F.3d at 535.

**1.      Statements to Police**

Peavy contends that his statements to police about the existence and location of a shotgun inside the house were involuntary and unwarned, in violation of the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966). "The Fifth Amendment guarantees that 'no person . . . shall be compelled in a criminal case to be a witness against himself.'" *New York v. Quarles*, 467 U.S. 649, 654 (1984). The privilege against self-incrimination bars the admission of coerced or involuntary statements. *See United States v. Fowler*, 535 F.3d 408, 416 (6th Cir. 2008). "When considering whether a confession is voluntary, we look at 'the totality of the circumstances' to determine whether 'a defendant's will was overborne in a particular case.'" *United States v. Craft*, 495 F.3d 259, 263 (6th Cir. 2007) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir.1994)).

Relevant factors include the defendant's age, his level of education and intelligence, whether he was warned of his constitutional rights, the length of the detention, the "repeated and prolonged

9

nature of the questioning," and the use of physical punishment "such as the deprivation of food or sleep." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "A confession is involuntary if the police engaged in objectively coercive activity, the coercive activity was sufficiently severe to overcome the defendant's will and the defendant's statements stemmed from the coercion." *Craft*, 495 F.3d at 263 (citing *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir.1999)).

There is no evidence to indicate that the actions of the officers were "objectively coercive" or that Peavy's will was overborne. He had not been detained or questioned for any length of time when the questions were asked. Arrests often involve numerous police officers and a certain amount of chaos and confusion, but a hectic atmosphere is not necessarily a coercive one. *See United States v. Church*, 970 F.2d 401, 404 (7th Cir. 1992) (finding that the "psychological pressure" resulting from the "noise and confusion" of an armed SWAT team invading a house was not coercive). Nor does the fact that Peavy was handcuffed render his statements involuntary. *See United States v. Miller*, 48 F. App'x 933, 952 (6th Cir. 2002) (finding that a statement was voluntary despite the fact that the defendant was handcuffed and surrounded by police officers). The government admits that Peavy was not advised of his *Miranda* rights before making the statements in question, but without any additional evidence of coercive police conduct, there is no basis to find that Peavy's statements were involuntary. *See Doody v. Schriro*, 548 F.3d 847, 860 (9th Cir. 2008) ("Warnings and a waiver are *not* dispositive of a confession's voluntariness." (emphasis in original) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)); *see also United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000) (en banc) ("[C]oercive police activity is a necessary predicate to finding that a confession is not voluntary.").

Peavy next contends that his statement should have been suppressed because he was not advised of his constitutional rights before police officers asked him about the existence of firearms. Under the familiar rule of *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. The government does not dispute that Peavy was in custody and was asked questions before being given *Miranda* warnings, but it argues that the public safety exception to *Miranda* applies and that Peavy's statement was therefore admissible.

"[W]hen officers ask 'questions necessary to secure their own safety or the safety of the public' as opposed to 'questions designed solely to elicit testimonial evidence from a suspect,' they do not need to provide the warnings required by *Miranda*." *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007) (quoting *Quarles*, 467 U.S. at 659). The public safety exception applies "when officers have a reasonable belief based on articulable facts that they are in danger." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). We use a two-pronged inquiry to evaluate the reasonableness of an officer's belief that he or the public is in danger:

> [A]t a minimum, [the officer] must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to the weapon and inflict harm with it. The public safety exception is applied if and only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety.

*Id.* Peavy argues that neither prong of this test is met because the officers had no reason to believe that he might be armed, and no reason to believe that anyone other than police might gain access to a weapon.

11

Peavy has an extensive criminal history dating back to the late 1970's, including multiple auto thefts, serious drug convictions (including a Class A federal felony), and domestic violence. His criminal activity apparently continued unabated from 1978 through October 2009, just six months before he was arrested in this case. The officers that arrested Peavy in April 2010 were well aware of his criminal background. Peavy's extensive history with drugs and violence gave the officers reason to suspect that he might have a weapon in the house. *See, e.g.*, *United States v. Till*, 434 F.3d 880, 884 (6th Cir. 2006) (recognizing the "propensity of people involved with drugs to carry weapons"); *United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011) ("[T]his Court has long recognized that, as Forrest Gump might say, drugs and guns go together like peas and carrots."). Although Peavy's only conviction specifically for a weapons violation was in 1978, his drug and domestic violence convictions span that entire period, with the last drug conviction coming in 2004 and the last domestic violence conviction in 2006. Peavy's considerable experience with drugs and violence gave the officers a reasonable belief that he might have a weapon, and the first prong of the inquiry is therefore satisfied.

Peavy argues that the second prong of the inquiry is not satisfied because there was no reason to believe that anyone other than police might gain access to a weapon. He relies on *United States v. Carrizales*, No. 3:10CR004, 2012 WL 3835062 (N.D. Ohio Sept. 29, 2010), in which a district court found that the public safety exception to *Miranda* did not apply when police knew that no one other than the defendant, his girlfriend, and her three children were present in the house. *Id.* at *3. On the contrary, police in this case had several reasons to suspect that someone other than Peavy and Hutson, both of whom were detained immediately upon entry, was in the house. Three specific facts

support the officers' belief: first, they observed three cars parked in the driveway of the house; second, they heard multiple voices inside the house; and third, there was a delay between the officers' initial knock on the door and Peavy's opening it. The combination of these facts could easily have led the officers to believe that at least a third person was in the house. When they discovered only two people inside after the door was finally opened, they could have believed that someone was elsewhere in the house retrieving a weapon. The circumstances of their approach and entry into the house gave the officers a reasonable belief that a third person might gain access to a weapon. Peavy offers no context-specific evidence that might rebut the presumption that the officers' belief was reasonable. The public safety exception to *Miranda* therefore applies, and Peavy's motion to suppress was properly denied.

### 2. The Shotgun

Peavy argues that the shotgun itself should have been suppressed as "fruit of the poisonous tree" following what he claims was an involuntary, pre-*Miranda* statement. The Fifth Amendment's protection against compelled self-incrimination, from which *Miranda*'s warning requirement is derived, *see Dickerson v. United States*, 530 U.S. 428, 444 (2000), prevents the government from introducing unwarned statements against a criminal defendant at trial, but it does not apply to physical evidence. *See United States v. Patane*, 542 U.S. 630, 637 (2004). "[T]he *Miranda* rule protects against violations of the Self–Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *Id.* at 634. "There is therefore no reason to apply the 'fruit of the poisonous tree' doctrine . . . ." *Id.* at 642. Thus, even

13

assuming that the police violated *Miranda* in this case, the shotgun itself would still have been admissible at trial.[3]

**C.     Peavy's Sentence**

We "review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard." *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007).  This reasonableness review "has two components: procedural and substantive." *Id.*  "Consequently, our reasonableness review requires inquiry into both the length of the sentence and the factors evaluated and the procedures employed by the district court in reaching its sentencing determination." *United States v. Herrera–Zuniga*, 571 F.3d 568, 581 (6th Cir. 2009).

Peavy argues that his sentence was procedurally unreasonable because the district court did not adequately explain its rationale.  In reviewing a challenge for procedural reasonableness, "[w]here a defendant fails to properly preserve an issue for appeal," we review for plain error only. *Id.* at 580.  As we held in *United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004), "district courts are required, after announcing sentence, to ask the parties whether they have any objections to the sentence that have not previously been raised." *Herrera–Zuniga*, 571 F.3d at 578.  Peavy was asked by the district court if he had any further objections to be placed on the record pursuant to *Bostic*,

---

[3] Had Peavy's statement been involuntary or coerced, as opposed to simply unwarned, the shotgun should have been excluded at trial.  "[T]hose subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (emphasis in original).  However, we have already determined that Peavy's statement was not involuntary, and the shotgun was therefore admissible.

and Peavy responded that he did not. Therefore, Peavy's procedural objection should be reviewed for plain error.

To establish plain error, "a defendant must show (1) error[,] (2) that was obvious or clear, (3) that affected defendant's substantial rights[, and] (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). "[P]lain error review should be extremely deferential to the sentencing judge." *United States v. Wallace*, 597 F.3d 794, 804 (6th Cir. 2010). Procedural reasonableness review "begins with a robust review of the factors evaluated and the procedures employed by the district court in reaching its sentence." *Bolds*, 511 F.3d at 578. Specifically, this Court must ensure that the district court:

> (1) properly calculated the applicable advisory Guideline range; (2) considered the other § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen, including any rejection of the parties' arguments for an outside-Guidelines sentence and any decision to deviate from the advisory Guidelines range.

*Id.* at 581. In reviewing the district court's application of the § 3553(a) factors, "there is no requirement . . . that the district court engage in a ritualistic incantation to establish consideration of a legal issue," or that it "make specific findings related to each of the factors considered." *Id.* at 580. The district court must provide an "articulation of the reasons [it] reached the sentence ultimately imposed." *United States v. Jackson*, 408 F.3d 301, 305 (6th Cir. 2005).

The district court in this case clearly articulated its reasons for imposing the sentence it did. It carefully considered Peavy's request to be sentenced below the applicable Sentencing Guidelines range, and in doing so specifically mentioned Peavy's age, the fact that he had cooperated with the government, his family, and the difficulties of dealing with prison life and drug addiction. The

district court also considered Peavy's extensive criminal history, including his history of domestic violence and theft, and the fact that he had returned to criminal activity each time he was released from prison. Given all these factors, the district court decided to sentence Peavy to 100 months' imprisonment, a term on the low end of the Guidelines range.

Peavy argues that the district court did not clearly articulate its reasons for sentencing Peavy outside the applicable range, but this argument is based on a misunderstanding of how the Guidelines range was calculated in this case. Peavy pleaded guilty to conspiracy to commit wire fraud, and he was separately convicted by a jury of being a felon in possession of a firearm. These two cases were combined for sentencing. For the conspiracy count, the district court found that Peavy's total offense level was 7 and his criminal history category was VI. For the firearms count, the district court found that Peavy's total offense level was 24 and his criminal history category was VI, yielding a range of 100 to 125 months' imprisonment. Because the district court was sentencing on multiple counts, its next task was to "[a]pply Part D of Chapter Three to group the various counts and adjust the offense level accordingly." U.S.S.G. § 1B.1.1(a)(4). Peavy's two counts are not "closely related" under § 3D1.2, and each count is therefore considered a separate Group. *See id.* §3D1.2, comment. (n.7) ("Note also that a Group may consist of a single count."). Because the total offense level for Peavy's conspiracy count (7) was "9 or more levels less serious" than the total offense level for his firearms count (24), the district court disregarded the conspiracy count and found that Peavy's total combined offense level was 24. *See id.* § 3D1.4(c).

Based on a combined offense level of 24 and a criminal history category of VI, the district court calculated a Guidelines range of 100 to 125 months. However, because the statutory maximum

sentence for the firearms count was ten years, or 120 months, the top of the Guidelines range should have been adjusted downward to 120 months. *See id.* § 5G1.1(c). Although the district court does not seem to have recognized that the Guidelines range should have been adjusted because of the 120-month statutory maximum, its chosen sentence of 100 months complies with the statute and falls within the Guidelines range. The Guidelines instruct that the sentence be imposed on each count, with the sentences to run concurrently. *See id.* § 5G1.2, comment. (n.1). Because the sentence complies with the relevant provisions of the Guidelines, it is not plainly erroneous.

Peavy also challenges the substantive reasonableness of his sentence. Our review of a sentence for substantive reasonableness "requires inquiry into . . . the length of the sentence and the factors evaluated . . . by the district court in reaching its sentencing determination." *Herrera–Zuniga*, 571 F.3d at 581. Review for substantive reasonableness focuses on the appropriateness of "the length of the sentence," *id.*, and scrutinizes whether a sentence is adequate, but not "greater than necessary to accomplish the sentencing goals identified by Congress in 18 U.S.C. § 3553(a)." *Id.* at 590. We have elaborated that "[a] sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Presley*, 547 F.3d 625, 630–31 (6th Cir. 2008).

The substantive reasonableness inquiry "take[s] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Bolds*, 511 F.3d at 581. We "apply a rebuttable presumption of substantive reasonableness" to "sentences within the Guidelines." *Id.* The district court considered many factors when imposing Peavy's sentence, including his family

17

situation, age, criminal history, the nature of the crime, and the safety of the public. Peavy's argument that his sentence was unreasonable centers around his misunderstanding of the way in which his Guidelines range was calculated, and he does not present any argument that would rebut the presumption that his within-Guidelines sentence was substantively reasonable.

## CONCLUSION

For the reasons discussed above, we **DISMISS** Reese's appeal as barred by the appeal waiver in his plea agreement, and we **AFFIRM** Peavy's conviction and sentence.