RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0111p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 12-1173

LONNIE HODGE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:11-cr-113-1—Janet T. Neff, District Judge.

Argued: January 22, 2013

Decided and Filed: April 19, 2013

Before: SUHRHEINRICH, MOORE, and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Richard A. Cline, RICHARD CLINE & CO., LLC, Columbus, Ohio, for Appellant. Clay M. West, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Richard A. Cline, RICHARD CLINE & CO., LLC, Columbus, Ohio, for Appellant. Sean C. Maltbie, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. Officers from the Calhoun County Sheriff's Department and the Battle Creek Police Department found a pipe bomb in Lonnie Hodge's home while executing a search warrant for evidence of a methamphetamine lab. They also found marijuana, prescription drugs, drug paraphernalia, and a rifle. A federal grand jury indicted Hodge for possession of an unregistered destructive device (the pipe bomb) and possession of a firearm while

1

unlawfully using a controlled substance. Hodge moved to suppress the pipe bomb, arguing that the officers' warrant was not supported by probable cause and that statements he made alerting officers to the pipe bomb were obtained through custodial interrogation without *Miranda* warnings. The district court denied the motion. Hodge entered a conditional guilty plea to both counts of the indictment and now appeals the denial of his suppression motion. Because probable cause supported the search warrant and the Fifth Amendment does not require suppression of the evidence obtained through Hodge's statements, we affirm the district court's judgment.

## I.

### A.

On October 18, 2010, Calhoun County Sheriff's Office Deputy Matt Gault received word of illegal activity occurring in Hodge's Battle Creek residence from a local resident, Jacob Banks. Banks told Gault that on October 16, he witnessed "the manufacture of methamphetamine, several firearms, and a bomb" at Hodge's home. He observed an associate of Hodge, Brandy Freeze, shaking "two sports drink bottles that appeared to have a grayish, sandy, sludge in the bottom with liquid and pieces of black chunks floating on the top," characteristic of a "one pot style methamphetamine cook." Banks also gave Gault a detailed description of a pipe bomb Hodge showed him. Hodge claimed the pipe bomb had enough power to "blow up the entire house" if detonated. Banks also stated that Hodge showed him "an all-black firearm that he identified as an AK-47." Finally, Hodge allegedly told Banks that if the police confronted Hodge, he "would shoot every cop that he could."

Gault relayed the tip to Bryan Gandy, a detective in the Sheriff's Office specializing in drug investigations, who immediately set to work corroborating Banks's story. He found that Hodge purchased ephedrine or pseudoephedrine from local stores three times between September 30, 2010 and October 14, 2010. Using police records and Banks's description of Hodge, he confirmed Hodge's identity and residence. Gandy discovered that the Sheriff's Office sought a search warrant for a methamphetamine lab

operated by Freeze in Pennfield Township, Michigan on September 10, 2010, and that Battle Creek Police Department officers investigated methamphetamine production by Hodge and Freeze at a different location in Battle Creek on October 5, 2010. Finally, Gandy found two "silent observer" tips from the week of October 10, 2010 stating "that there is a large amount of traffic and it is believed that there is methamphetamine activity and guns" at Hodge's Battle Creek residence.

Gandy prepared an affidavit using his investigative findings and Banks's statements and successfully applied for a warrant from a Calhoun County magistrate to search Hodge's home for evidence of a methamphetamine lab and weapons. The affidavit made no mention of the pipe bomb and gun Banks observed, although it did include the "silent observer" tips mentioning guns. Gandy later testified that he omitted that information to focus on evidence of methamphetamine production because "that is what I had the most evidence for at that time." Gandy believed the warrant's authorization to search for "[a]ny and all firearms, ammunition, [and] weapons located on the property" was broad enough to cover seizure of a pipe bomb.

Gandy then contacted Matt Robinson, the Battle Creek Police Department's coordinator of methamphetamine investigations, for assistance in executing the warrant on the evening of October 18. Both agreed that the Police Department's Emergency Response Team ("ERT") would be needed since there were credible allegations of dangerous weapons at Hodge's residence. The planned search would proceed in three phases. First, the ERT would enter the home and secure any persons in it. Second, Robinson would lead other Police Department officers in an initial test of the home for dangerous gases associated with methamphetamine production. Third, once the ERT secured the home and completed the initial sweep for dangerous gases, Gandy and the Sheriff's Office would take over the investigation and execute a thorough search of the residence for evidence specified in the warrant. Gandy explained that during such a search, the police "go into one room and go completely through that room, top to bottom, inside every drawer, [and] inside closets." Because of the reports about a bomb in the house, Robinson requested that Marc Pierce, a police officer with explosives

training, be dispatched with the ERT to Hodge's home.

Robinson, Gandy, and the ERT arrived at Hodge's home in the early evening. They knocked on the front door, announced their presence, and breached the door with a ram when there was no immediate response. As Robinson and several other officers entered a bedroom, Hodge "came around the corner, immediately to [Robinson's] left within probably a foot or two," wielding a screwdriver and "screaming" incoherently at the officers. Hodge, who is 6' 6" tall and weighs 320 pounds, quickly dropped the screwdriver but continued to scream and ball his fists, after which officers subdued and handcuffed him. The officers handcuffed Hodge behind his back, led him outside the house, and seated him in a chair on the front lawn. This took place just after 7:20 p.m., the time that Pierce arrived at the house.

While Robinson and the ERT officers were re-entering the home to begin their sweep for methamphetamine-related gases, Gandy asked Hodge, without first giving *Miranda* warnings, "if there is anything in the house that could get anyone there hurt, any active meth labs, meth waste, bombs, anything like [that] at all." Hodge said no. Pierce also asked about a bomb, and after receiving a similar response, he received permission from his supervisor to leave Hodge's home. Pierce left the scene between 7:25 and 7:30 p.m. Gandy then had a brief conversation with Hodge about whether "anybody else had been staying at the house" because he was concerned about the arrival of other people who could access the guns Hodge allegedly possessed. The discussion hit a lull. Gandy, who was standing about six feet away from Hodge, turned away from Hodge and towards the house, waiting for Robinson and his crew to finish the gas sweep so he could begin the evidentiary search.

One to two minutes after they had stopped talking, Gandy overheard Hodge "blurt[] out that there [was] a bomb inside" the house. Gandy immediately pressed Hodge for more information, and Hodge told Gandy that the bomb was wrapped in a towel and sitting on top of a kitchen cabinet in an area where decorative items might be displayed. As Robinson was exiting the house after completing the gas sweep, he overheard Gandy and Hodge talking about a bomb and began asking his own questions

about it.  Robinson later testified that he asked these questions to learn more about the bomb's construction, appearance, and method of detonation out of a concern for the safety of the officers in the house.  Robinson entered the home and observed the object Hodge described.

The officers called Pierce at 7:45 p.m. about fifteen minutes after dismissing him and asked him to return to Hodge's home.  Using a robot, Pierce retrieved and neutralized the pipe bomb.  While the bomb was a small object—five inches high, with a diameter of two inches—Pierce testified that it was "rather large" for a pipe bomb.  Once Pierce neutralized the pipe bomb, Gandy proceeded with the full evidentiary search of the house.  While the search did not uncover evidence of a methamphetamine lab as the officers originally anticipated, the officers found marijuana, prescription drugs, drug paraphernalia, and a Marlin .22 caliber long rifle during the search.

**B.**

The government charged Hodge with (1) knowing possession of an unregistered "firearm," 26 U.S.C. § 5861(d), and (2) possessing a firearm while being an unlawful user of a controlled substance, 18 U.S.C. § 922(g).  The first count refers to the pipe bomb; Congress defined the term "firearm" broadly to include any "destructive device." *See* 26 U.S.C. § 5845(a)(8).  The second count refers to the rifle and drugs found in Hodge's home.

Hodge moved to suppress the pipe bomb and the statements he made leading to its discovery.  As an initial matter, the district court rejected Hodge's argument that the search warrant was not supported by "probable cause."  It then conducted a lengthy evidentiary hearing as to Hodge's claim that the bomb should be suppressed because officers found it as a result of statements obtained in violation of *Miranda* and the Fifth Amendment.  Robinson, Gandy, Pierce, and Joy Brown, a nurse who examined Hodge after his arrest, all gave testimony at this hearing.  After the presentation of evidence, the district court denied Hodge's motion from the bench.  It found that Hodge's injuries did not demonstrate that his will was overborne by the officers when they subdued him in the house; that he volunteered his statements about the pipe bomb; that the questions the

officers asked Hodge were driven by valid public safety concerns; and that the bomb would have been inevitably discovered when the officers executed the search warrant.

After the denial of his suppression motion, Hodge reached a plea agreement with the government that preserved his right to appeal the denial of his suppression motion. Hodge pled guilty to both counts in the indictment on September 19, 2011, and received a sentence of thirty-six months in prison on February 1, 2012.  He filed a notice of appeal on February 3.

## II.

When the denial of a motion to suppress is appealed, this court reviews the district court's factual findings for clear error and its legal determinations *de novo*. *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008).  "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).  Because the government prevailed in the district court, we must "consider the evidence in the light most favorable to the government."  *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008).

## III.

Hodge first challenges the validity of the search warrant that the officers obtained.  Under the Fourth Amendment, a search warrant may only issue "upon probable cause."  U.S. Const. amend. IV.  Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  This "practical, common-sense decision" must be made based on "all the circumstances set forth in the affidavit" provided by the officers seeking a warrant.  *Id.*  The magistrate's finding of probable cause "'should be paid great deference by reviewing courts.'"  *Id.* at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)); *see also United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) ("This circuit has long held that an issuing magistrate's discretion

should only be reversed if it was arbitrarily exercised.").

The evidence presented in the affidavit amply supported a finding of probable cause that Hodge was engaged in methamphetamine production. Statements from a source named in a warrant application, such as Banks, are generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability. *United States v. Miller*, 314 F.3d 265, 269–70 (6th Cir. 2002) (rejecting argument that a warrant was invalid because it "failed to provide any basis as to the reliability or veracity" of a named informant); *United States v. Pelham*, 801 F.2d 875, 878 (6th Cir. 1986) ("When a witness has seen evidence in a specific location in the immediate past, and is willing to be named in the affidavit," probable cause is generally established).

Hodge argues that "nothing in the affidavit addressed Banks'[s] reliability," but "independent corroboration of an informant's story is not necessary to a determination of probable cause." *United States v. McCraven*, 401 F.3d 693, 698 (6th Cir. 2005). Even so, Gandy sought independent corroboration of Banks's story by looking through ephedrine and pseudoephedrine purchase logs, police records, and "silent observer" tips, and including facts from those sources in the affidavit. At oral argument, Hodge noted some imperfections in the affidavit that he claims undermine the probable cause finding. For instance, the affidavit does not acknowledge that Banks was aware his statements would be used in a warrant application, does not state how large Hodge's purchases of ephedrine or pseudoephedrine were, and does not confirm that the "silent observer" tips came from a source other than Banks. None of these theories were developed by Hodge in the district court, and to the extent there is ambiguity in the record on these points, we must resolve those ambiguities in favor of the government. *See Campbell*, 549 F.3d at 370. We therefore reject Hodge's argument that the warrant was not supported by probable cause.

**IV.**

Next, Hodge argues that the officers obtained his statements about the pipe bomb by violating the rule of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that both the statements and the bomb should be suppressed as a result of that violation. *Miranda* prohibits use by the government of statements "stemming from custodial interrogation of the defendant" to prove its case against the defendant, if those statements were made before the defendant was properly advised of his rights. *Miranda*, 384 U.S. at 444. This exclusionary rule exists to further "the interest of society in deterring unlawful police conduct." *Nix v. Williams*, 467 U.S. 431, 443 (1984). We hold that under either the "public safety" exception to *Miranda* articulated in *New York v. Quarles*, 467 U.S. 649 (1984), or the inevitable discovery doctrine, the questions the officers asked about the bomb and the evidence obtained from Hodge's responses to those questions were both admissible.

.                                              **A.**

In *Quarles*, the Supreme Court held that "overriding considerations of public safety" could justify a failure to provide *Miranda* warnings before initiating custodial interrogation. 467 U.S. at 651. Such questioning is permissible when "officers have a reasonable belief based on articulable facts that they are in danger." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). Determining whether an officer's belief was "reasonable" requires "consideration [of] a number of factors, which may include the known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest." *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007). As this is an objective standard, the court reviews the reasonableness of an officer's belief *de novo*. *Talley*, 275 F.3d at 563.

We have previously addressed the *Quarles* standard in cases involving guns, but not bombs. *See, e.g.*, *Williams*, 483 F.3d at 427 (sawed-off shotgun); *Talley*, 275 F.3d at 562 (semi-automatic handgun). In *Williams*, the court held that *Quarles* requires an

officer to "have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it."  483 F.3d at 428.  It phrased this test in mandatory terms.  *Id.* ("The public safety exception applies *if and only if* both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety.").  Hodge asks us to apply the *Williams* test in this case, arguing that since the government did not show the officers searching Hodge's home were aware of a third party who could access a pipe bomb, the public-safety exception is inapplicable.

The critical inquiry in any case where *Quarles* is invoked is whether "officers have a reasonable belief based on articulable facts that they are in danger," *Talley*, 275 F.3d at 563, and the reasonableness of an officer's perception of danger will always depend on the type of weapon in question.  *Williams* reaches the sensible conclusion that in a case involving a *gun*, the police must be aware of a third party who can access the gun and harm others.  On its own, the gun does not raise a reasonable threat of danger. But in a case involving a *bomb*, the presence of third parties who can access the bomb is usually not a compelling consideration.  Bombs are potentially unstable and may cause damage if ignored or improperly handled by the police.  We therefore agree with the government that *Williams* should be limited to situations where the "weapon" in question is one that a person must physically handle in order for it to present a threat to officers.

Precedent from other circuits addressing the *Quarles* exception in the context of bombs confirms the intuition that fears of a third party accessing a bomb are not required before asking a suspect questions about the bomb.  In *United States v. Khalil*, 214 F.3d 111 (2d Cir. 2000), police officers raided an apartment after receiving information that the men who occupied it possessed bombs.  214 F.3d at 115.  Police injured both suspects during the arrest, and the two men were taken to the hospital.  *Id.*  Officers questioned one of the men at the hospital about the construction of the bombs and whether or not he "planned to kill himself" by detonating them.  *Id.*  The court held that this last question was permissible under *Quarles* because it "had the potential for

shedding light on the bomb's stability." *Id.* at 121.  It was not relevant to the court that the police already had complete control of the crime scene when the officers went to the hospital to interview the defendant.  Likewise, in *United States v. Spoerke*, 568 F.3d 1236 (11th Cir. 2009), the Eleventh Circuit refused to suppress responses a defendant gave to questions asked by a police officer about the composition of devices he observed in the defendant's car that eventually proved to be pipe bombs.  568 F.3d at 1249.  The officer removed the items from the car before asking these questions, so, as in *Khalil*, there was no possibility of a third party intercepting the bombs.  *Id.*

We agree with the government that the statements Hodge made about the pipe bomb were properly admitted under *Quarles*. The questions the officers asked Hodge can be divided into two groups: those Pierce and Gandy asked about whether there was "anything in the house that could get anyone there hurt," including a bomb; and those Gandy and Robinson asked after Hodge admitted there was a bomb in the house.  As to the first set of questions, Gandy and Pierce had a "reasonable belief" that there was a pipe bomb in Hodge's house when they arrived to execute the search warrant.  Banks, the named informant, claimed that Hodge possessed a pipe bomb that could "blow up the entire house" if detonated and that he intended to hurt police if confronted.  The relatively limited inquiry Gandy and Pierce made was appropriately tailored to the information they possessed.  Once Hodge admitted the bomb was in the home, the questions Gandy and Robinson asked him were all directed to obtaining information about the bomb's construction and stability.  Both *Khalil* and *Spoerke* deemed such questions acceptable even though there was no evidence that a third party could access the bombs.  Accordingly, we conclude that the district court did not err in finding that Hodge's statements about the bomb, as well as the bomb itself, were admissible under *Quarles*.

## B.

Alternatively, the district court properly concluded that if the officers never asked Hodge about the pipe bomb, they would have inevitably discovered it while executing the search warrant.  When evidence of guilt "ultimately or inevitably would have been

discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Nix*, 467 U.S. at 444. The government must "demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995) (emphasis omitted). This burden is met if the government shows "that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999); *see also United States v. Kimes*, 246 F.3d 800, 803–04 (6th Cir. 2001) (deeming a bayonet and a knife found during an allegedly unlawful search of a car parked on Veterans' Administration property admissible because the weapon would have been found during an inventory search of the car required by VA policy). The court must "'view[] affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" *Kennedy*, 61 F.3d at 498 (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)). We review the district court's resolution of this mixed question of law and fact *de novo*. *Id.* at 497.

Based on Gandy's explanation of how he and Robinson planned to execute the search warrant, the district court found that even if Gandy and Pierce had never spoken to Hodge, officers would have still performed a full search of Hodge's home for evidence of a methamphetamine lab. "A lawful search of fixed premises generally extends to the entire area in which the object[s] of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search," including the opening of "closets, chests, drawers, and containers in which the [contraband] might be found." *United States v. Ross*, 456 U.S. 798, 820–21 (1982); *see also Colorado v. Bertine*, 479 U.S. 367, 375 (1987). When the "objects to be found" are small, the legitimate scope of the search is broad. *See United States v. Lengen*, 245 F. App'x 426, 434 (6th Cir. 2007) ("[A]lthough a warrant to search for a stolen vehicle would not justify opening a small wall safe in a bedroom closet, judicial authorization to search a home for . . . drug paraphernalia would clearly justify the

opening of doors, closets, drawers, safes, and other places where the listed items could be hidden.").

In this case, Hodge's pipe bomb sat in a visually prominent area of his home and was conspicuously covered in a towel. Given the search warrant's sweeping authorization to find "all equipment, chemicals, liquids, [and] powders used in the manufacture or production of narcotics," the officers would have been justified in examining this unusual object to see if it contained contraband, just as they would be justified in opening a safe or a drawer. They were looking for small items like the ephedrine and pseudoephedrine pills Hodge allegedly purchased from local drug stores, money or documents linked to drug transactions, and the sports drink bottles Banks claimed he had seen Hodge and Freeze use to make methamphetamine. We therefore agree with the district court's conclusion that the officers would have discovered the pipe bomb during the execution of the search warrant, even if they had not bothered to ask Hodge about the presence of a bomb in the house.

## V.

For the foregoing reasons, we affirm the judgment of the district court.